# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEL REAL, LLC, a California limited liability company,<br><br>                         Plaintiff,<br><br>              v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California,<br><br>                         Defendant. | 1:12-cv-001669 LJO-GSA<br><br><br>**MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS. 26 & 37)** |

## I. INTRODUCTION

Plaintiff Del Real, LLC ("Del Real") prepares, packages, and sells fully cooked meat and poultry dishes that are distributed and sold throughout California. Several California counties have threatened enforcement actions against Del Real, alleging that Del Real's products are packaged in violation of the nonfunctional slack fill provisions of the California Fair Packaging and Labeling Act ("CFPLA"), Cal. Bus. & Prof. Code §§ 12606, 12606.2. Del Real challenges CFPLA's slack fill regulations, arguing they are preempted as applied to meat and poultry products regulated by the Federal Meat Inspection Act ("FMIA") and Poultry Products Inspection Act ("PPIA").

Before the Court for decision are cross motions for summary judgment. Plaintiff's opening motion, filed March 20, 2013, seeks summary judgment as well as permanent injunctive and declaratory relief on Del Real's preemption claim. Doc. 26. In addition, Plaintiff seeks judgment in its favor on Defendant's justiciability and affirmative defenses. *Id*. Defendant Kamala Harris, the Attorney General of California, cross-moves for summary judgment, arguing that the CFPLA is not preempted because it is consistent with FMIA and PPIA; to the extent the CFPLA requires additional or different requirements, the CFPLA is inoperative, not preempted; and even if the CFPLA is partially

unconstitutional by virtue of preemption, the preempted provisions should be severed from the remainder of the statute. Doc. 37. Plaintiff filed a combined opposition and reply, Doc. 38, as did Defendant, Doc. 39. The motions were fully briefed as of July 12, 2013. Having reviewed these filings, and in light of the entire record, the Court does not believe oral argument is necessary to aid resolution of these motions, and hereby rules on the papers pursuant to Local Rule 230(g).

## II. <u>FACTUAL BACKGROUND</u>

Del Real's fully cooked meat and poultry Mexican dishes are packaged in heat and serve containers that are distributed and sold throughout California. Plaintiff's Statement of Undisputed Fact (PSUF) #1.[1] Certain meat and poultry dishes packaged in sixteen-ounce containers are sold in grocery stores. PSUF #2. Other meat and poultry dishes are sold in thirty-two and forty ounce containers at club stores. PSUF ## 3-4.

Del Real's packaging process occurs at a California facility subject to inspection by the United States Department of Agriculture under the FMIA and PPIA. PSUF #6. A USDA inspector is on site at Del Real's facility and present for all shifts. PSUF # 7. To Del Real's knowledge, the USDA has never expressed concern that Del Real's packaging is misleading in any way, nor has Del Real, to its knowledge, ever been subject to any investigation, allegation or charge by the federal government with respect to the fill of its products. PSUF #8.

In or around August 2010, the Sonoma County Division of Weights and Measures claimed to have measured the amount of slack fill in several of Del Real's packaged products, and reported that the packaging amounts to a "clear violation" of the CFPLA. PSUF ## 9-10. Likewise, the California Department of Food and Agriculture conducted its own investigation in October 2010 into the slack fill in two of Del Real's products, concluding that the packaging violated the CFPLA. PSUF #11. Similar investigations in Napa and Alameda Counties resulted in similar conclusions. PSUF #12. In November 2011, the Consumer Protection Divisions of the Alameda, Napa, and Sonoma County District Attorney's

---

[1] In this Memorandum Decision and Order, the Court has relied primarily on Defendant's response to the PSUF, Doc 37-2. Only those facts that are truly undisputed have been considered.

Offices sent a letter to Del Real, alleging that Del Real's packaging was in violation of the slack fill provisions of the CFPLA. PSUF # 14. A June 2012 letter from the Sonoma County District Attorney's Office expanded the allegations to other Del Real packaged food products. PSUF #15.[2]

### III. STANDARD OF DECISION

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence to support the non-moving party's case." *Id.*

Where a case, such as this one, does not turn on its facts, but rather presents a pure question of law, the matter is well suited for summary disposition. *Citizens for Honesty & Integrity in Reg'l Planning v. Cnty. of San Diego*, 258 F. Supp. 2d 1132, 1135 (S.D. Cal. 2003) appeal dismissed and remanded, 399 F.3d 1067 (9th Cir. 2005); *see also Comm. of Dental Amalgam Mfrs. & Distributors v. Stratton*, 92 F.3d 807, 810 (9th Cir. 1996).

---

[2] Del Real also packages and sells vegetarian dishes. *See* Herb Bowden Depo., Doc. 37-1, at 21-24, 32. Plaintiff does not contend that these dishes are subject to the FMIA and/or PPIA, nor does Plaintiff argue the CFPLA is preempted as to these products.

# IV. DISCUSSION

## A.   Justiciability Defenses.

Defendant raised three justiciability defenses in its Answer: (1) there is no Article III case or controversy, (2) that Plaintiff lacks standing, and (3) that the claims are not ripe. Plaintiff challenged these defenses in its motion for summary judgment. Doc. 26 at 15. Defendant did not respond. Because of its sua sponte duty to ensure Article III jurisdiction, the Court has independently examined these issues and wholly adopts the reasoning provided at pages 15 to 16 of Plaintiff's motion:

> Whether a "case or controversy within the meaning of Art. III of the Constitution" has been alleged when a plaintiff challenges a statute depends on whether the plaintiff can "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297-98 (1979) (internal quotations omitted). The Supreme Court has made clear, however, that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Id*. (internal quotations omitted). Instead, "[i]t is sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (quoting *Babbitt*, 442 U.S. at 298); *see Jacobus v. Alaska*, 338 F.3d 1095, 1104- 05 (9th Cir. 2003) (observing that the same "genuine threat of imminent prosecution" also satisfies the ripeness requirement). Here, both of these factors are clearly satisfied. Since 2010, California investigations have claimed that Del Real's meat and poultry products violate the slack fill requirements found in the CFPLA, and Del Real has not, to date, made any changes to its packaging. *See* Bowden Decl. ¶¶ 11-16; *see also* Bowden Decl. ¶ 15 & Ex. D at DelR0000083 (claiming Del Real "remains out-of-compliance with BPC § 12606.2").
>
> Moreover, there is clearly a credible threat that the challenged provision will be invoked against Del Real, given that county district attorneys have specifically stated their intent to "fil[e] a law enforcement action." Bowden Decl. ¶ 13 & Ex. B at DelR0000058. Given this live threat of enforcement, this suit is clearly justiciable before the Court.

Doc. 26 at 15-16.

Defendant also suggested in its Answer that this court should abstain from deciding this case under *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), and/or *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491 (1942). These doctrines do not apply to a request for declaratory relief in case of preemption. "*Burford* and *Pullman* abstentions are generally inappropriate when the case concerns

preemption." *Hotel Employees and Restaurant Employees Intern. Union v. Nevada Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir. 1993). District courts have broad discretion to stay or dismiss actions seeking declaratory judgment, as recognized in *Brillhart* and *Wilton*. *Brillhart*, 316 U.S. at 495; *Wilton*, 515 U.S. at  287. The *Brillhart-Wilton* doctrine rests on concerns about judicial economy and cooperative federalism. *Brillhart*, 316 U.S. at 495. In light of this purpose, district courts consider three primary factors when evaluating whether to entertain a declaratory judgment action: (1) avoiding needless determination of state law issues; (2) discouraging forum shopping; and (3) avoiding duplicative litigation. *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011). None of these concerns are present here. A claim of federal preemption requires analysis and determination of the scope of state law; and the facts do not suggest forum shopping or the risk of duplicative litigation.

**B.**   **Relevant Federal Statutes and Regulations.**

The FMIA and PPIA comprehensively regulate meat and poultry products, respectively, in order to protect "the health and welfare of consumers ... by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 201 U.S.C. § 602 (FMIA, applicable to cattle, sheep, swine, or goats); 21 U.S.C. § 451 (PPIA, applicable to poultry). Both the FMIA and PPIA contain requirements aimed at eliminating "misbranded" meat and poultry, including situations where the products' "container is so made, formed, or filled as to be misleading." 21 U.S.C. §§ 691(n)(4), 453(h)(4). Both Acts prohibit the sale of any meat or poultry product in any container of a "misleading form or size…." 21 U.S.C. §§ 607(d); 457(c). In addition, both Acts authorize the Secretary of Agriculture to prescribe "standards of fill of container for such articles not inconsistent with any such standards established under the Food, Drug, and Cosmetic Act [21 U.S.C. § 301 *et seq*.]." 21 U.S.C. §§ 607(c)(2), 457(b)(2). While this language clearly authorizes the Secretary to promulgate regulations pertaining to slack fill in meat and poultry product packaging, the Secretary has not directly addressed slack fill by regulation. Instead, the relevant FMIA regulations prohibit meat from being sold in packages "filled [so] as to be misleading." 9 C.F.R. § 317.8(a); *accord* 9 C.F.R. § 301.2 (defining the term "misbranded" to include any "meat food product … [i]f its container

is so made, formed, or filled as to be misleading"). Likewise, the PPIA's regulations prohibit the sale of any poultry product in "any container that is so made, formed, or filled as to be misleading." 9 C.F.R. § 381.129(a); *accord* 9 C.F.R. § 381.1 (adopting definition of "misbranded" used in the FMIA regulations). The FMIA and PPIA regulations do not otherwise address any subjects that could arguably be equivalent to the concept of slack fill.

Other federal statutes do regulate slack fill. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321 *et seq*., and Federal Fair Packaging and Label Act ("FFPLA"), 15 U.S.C. § 1451 *et seq*., or regulations promulgated thereunder, explicitly prohibit packages from containing "nonfunctional slack fill," and provide specific examples of the limited circumstances in which slack fill is deemed functional, and thus permissible. For example, the FDCA's implementing regulations provide:

> A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:
>
> (1) Protection of the contents of the package;
>
> (2) The requirements of the machines used for enclosing the contents in such package;
>
> (3) Unavoidable product settling during shipping and handling;
>
> (4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;
>
> (5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or
>
> (6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other nonmandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

21 C.F.R. § 100.100(a); *see also* 15 U.S.C. § 1454(c) (FFPLA) (permitting issuance of regulations to "prevent the nonfunctional-slack-fill of packages containing consumer commodities" and defining a package as "nonfunctionally slack-filled if it is filled to substantially less than its capacity for reasons other than (A) protection of the contents of such package or (B) the requirements of machines used for enclosing the contents in such package."). However, meat and poultry products regulated by the FMIA and PPIA are specifically <u>excluded</u> from application of the FDCA's and FFPLA's requirements. 21 U.S.C. § 392(a) (exempting meat products from the FDCA); 21 U.S.C. § 467f(a) (exempting poultry products from the FDCA);15 U.S.C. § 1459(a)(1) (exempting meat and poultry products from the FFPLA).

## C.   <u>Relevant State Statutes and Regulations.</u>

The CFPLA, like the FDCA and FFPLA, specifically prohibits nonfunctional slack fill. The CFPLA generally prohibits containers "made, formed, or filled [so] as to be misleading" and defining a container "that does not allow the consumer to fully view its contents" to be per se "misleading if it contains nonfunctional slack fill." Cal. Bus. & Prof. Code § 12606(b). Slack fill is defined as "the difference between the actual capacity of a container and the volume of product contained therein." *Id*. "Nonfunctional slack fill" is "the empty space in a package that is filled to less than its capacity" for reasons other than those specifically permitted by the CFPLA. *Id*. In addition, a separate CFPLA provision prohibits nonfunctional slack fill in "food containers" subject to the FDCA's slack nonfunctional slack fill prohibitions. Cal. Bus. & Prof. Code § 12606.2. This provision is structured so as to impose the same requirements as the FDCA. *Id*. at § 12606.2(e).[3]

## D.   <u>General Preemption Standards.</u>

"Federal law may pre-empt state law in three different ways." *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002).

---

[3] These two provisions differ slightly in the types of situations in which the presence of slack fill is permissible. These differences are not material to the present dispute.

First, Congress may preempt state law by so stating in express terms. *Jones v. Rath Packing Co*., 430 U.S. 519, 525 604 (1977). Second, preemption may be inferred when federal regulation in a particular field is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). In such cases of field preemption, the "mere volume and complexity" of federal regulations demonstrate an implicit congressional intent to displace all state law. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000) (internal quotations and citation omitted). Third, preemption may be implied when state law actually conflicts with federal law. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982). Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

*Id*. Only the first form of preemption -- express preemption -- is at issue in the present motions.[4]

Overlying the basic forms of preemption "are 'two cornerstones' of preemption jurisprudence." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 566 (2009)).

"First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.' " [*Wyeth*, 555 U.S. at 566.] Second, "[i]n all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id*. at 1194–95 [citation].

*Aguayo*, 653 F.3d at 917. Pursuant to the so-called "presumption against preemption," "pre-emption will not lie unless it is the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 668 (1993). "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *Id*. Where a statute contains an express preemption clause the "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp*., 537 U.S. 51, 62-63 (2002). The presumption against preemption requires courts to read express preemption clauses narrowly. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996); *see also Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1117-18 (N.D. Cal. 2010). "However, a

---

[4] Plaintiff's preemption claim, the only claim remaining in the case, *see* Doc. 22, only alleges express preemption, Doc. 1 at ¶¶ 52-58.

narrow interpretation is not the same as one that is unreasonably cramped." *Nat'l Broiler Council v.*

*Voss*, 44 F.3d 740, 743 n.2 (9th Cir. 1994).[5]

Both the FMIA and PPIA were amended in the 1960s by, among other things, the addition of

express preemption provisions. FMIA's preemption provision, the second sentence of which is at issue

in this case, provides:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of section 642 of this title, if consistent therewith, with respect to any such establishment. <u>Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment,</u> or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

21 U.S.C. § 678 (emphasis added). The PPIA's preemption provision contains similar language:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment. <u>Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official</u>

---

[5] Plaintiff maintains that the presumption against preemption does not apply where Congressional intent to preempt state law is "clear and manifest," citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 425 (1977). *Rath Packing* did hold that when Congress "acts in a field which the States have traditionally occupied, the basic assumption from which pre-emption must be viewed is that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. at 544-55 (internal quotation and citation omitted). However, the subsequent jurisprudence discussed above makes it clear that the presumption against preemption has some impact even in express preemption cases, insofar as it requires such clauses to be interpreted narrowly, without "unreasonably cramping" their function.

<u>establishment in accordance with the requirements under this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this chapter, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment</u>, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

21 U.S.C. § 467e (emphasis added).[6]

**E.      Express Preemption Analysis.**

The key inquiry in this case is whether the slack-fill provision of the CFPLA falls within the scope of the FMIA and/or PPIA's preemption provisions. Both preemption provisions prohibit "marking, labeling, packaging, or ingredient requirements" that are "in addition to or different than [sic], those made under" the FMIA and/or PPIA. 21 U.S.C. §§ 678, 467(e). It appears to be undisputed that the CFPLA's slack fill requirements are "packaging" requirements. Therefore, the question becomes: Are they "in addition to or different than" the packaging requirements in the FMIA and/or PPIA?

As outlined above, the FMIA and PPIA generally prohibit the sale of "misbranded" meat and poultry, including situations where a products' "container is so made, formed, or filled as to be misleading." 21 U.S.C. §§ 691(n)(4), 453(h)(4). Both Acts prohibit the sale of any meat or poultry product in any container of a "misleading form or size…." 21 U.S.C. §§ 607(d); 457(c). In addition, both Acts authorize the Secretary of Agriculture to prescribe "standards of fill of container for such articles not inconsistent with any such standards established under the Food, Drug, and Cosmetic Act [21 U.S.C. § 301 *et seq.*]." 21 U.S.C. §§ 607(c)(2), 457(b)(2). It is undisputed that Secretary has not directly addressed slack fill by regulation. Instead, the relevant FMIA regulations prohibit meat from being sold in packages "filled [so] as to be misleading." 9 C.F.R. § 317.8(a); *accord* 9 C.F.R.  301.2

---

[6] "The legislative history of the two Acts and subsequent amendments indicate a congressional intent to construe the PPIA and the FMIA consistently." *Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996) (citing H.R. Rep. No. 1333, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 3426).

(defining the term "misbranded" to include to any "meat food product … [i]f its container is so made, formed, or filled as to be misleading"). Likewise, the PPIA's regulations prohibit the sale of any poultry product in "any container that is so made, formed, or filled as to be misleading." 9 C.F.R. § 381.129(a); *accord* 9 C.F.R. § 381.1 (adopting definition of "misbranded" used in the FMIA regulations).

Two regulatory provisions promulgated pursuant to the FMIA and PPIA arguably expand upon the meaning of "misleading" in the context of packaging. 9 C.F.R. § 317.8(5)(i) provides:

> Coverings shall not be of such color, design, or kind as to be misleading with respect to color, quality, or kind of product to which they are applied. For example, transparent or semitransparent coverings for such articles as sliced bacon or fresh (uncooked) meat and meat food products shall not bear lines or other designs of red or other color which give a false impression of leanness of the product. Transparent or semitransparent wrappers, casings, or coverings for use in packaging cured, cured and smoked, or cured and cooked sausage products, and sliced ready-to-eat meat food products may be color tinted or bear red designs on 50 percent of such wrapper or covering: Provided, That the transparent or semitransparent portion of the principal display panel is free of color tinting and red designs: And provided further, That the principal display panel provides at least 20 percent unobstructed clear space, consolidated in one area so that the true nature and color of the product is visible to the consumer.

9 C.F.R. § 317.8(17) provides:

> When any product is enclosed in a container along with a packing substance such as brine, vinegar, or agar jelly, a declaration of the packing substance shall be printed prominently on the label as part of the name of the product, as for example, "frankfurts packed in brine," "lamb tongue packed in vinegar," or "beef tongue packed in agar jelly," as the case may be. The packing substance shall not be used in such a manner as will result in the container being so filled as to be misleading.

Although these two regulations do not address slack fill, they do address situations in which packaging could be misleading. The FMIA and PPIA regulations do not otherwise address any subjects that could arguably be equivalent to the concept of slack fill.

Defendant maintains that because the FMIA and PPIA do not specifically define how nonfunctional slack fill is to be assessed (i.e. the federal laws leave open whether nonfunctional slack fill is "misleading" under federal law), the more specific California law does not contravene the federal law. Doc. 37 at 9. But whether the CFPLA conflicts with federal law is not the question. As explained above, while preemption provisions must be narrowly construed, the language of the preemption provision itself is of primary importance. *See Medtronic*, 518 U.S. at 484-85. The key question is whether the

11

CFPLA's slack fill provisions constitute "requirements ... in addition to, or different than, those made under" the FMIA or PPIA.

The Supreme Court recently examined this language in the FMIA's preemption provision in *National Meat Association v. Harris*, 132 S. Ct. 965, 968 (2012), a challenge to a California statute "dictating what slaughterhouses must do with ... nonambulatory pigs." There, the Supreme Court reasoned: "FMIA's preemption clause sweeps widely.... The clause prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act...." *Id.* at 970. The federal regulatory system at issue in *National Meat* "begins with an ante-mortem examination of each animal brought to a slaughterhouse." *Id.* at 968 (internal citation and quotation omitted). If the federal inspector finds no evidence of disease or injury, the animal may be approved for slaughter. *Id.* If, however, the animal is "dead or dying, comatose, suffering from a high fever, or afflicted with a serious disease or condition," the animal is designated as "U.S. Condemned." *Id.* (quoting 9 C.F.R. § 309.3; 311.1 *et seq.*). Such animals are killed separately from others, and no part of its carcass may be sold for human consumption. *Id.* at 969 (citing 9 C.F.R. § 309.13(a); 21 U.S.C. 610(c)). Federal meat inspectors may also utilize an intermediate option, "U.S. Suspect," which includes all nonambulatory animals not classified as "U.S. Condemned." *Id.* (citing 9 C.F.R. § 309.2). These animals must be set apart, specially monitored, and, unless reclassified, slaughtered separately from other livestock. *Id.* (citing § 309.2(n)). Following slaughter, an inspector decides at a post-mortem examination whether and to what extent parts of the suspect animal's carcass may be processed for human consumption. *Id.* (citing 9 C.F.R. pts. 310 and 311)

In contrast, California's regulations required immediate euthanization of any "downer animal" and provided that no part of the animal's carcass may be processed or butchered for food. This was just one example of how, "at every turn," the challenged California statute "impose[d] additional or different requirements on swine slaughterhouses: It compels them to deal with nonambulatory pigs on their premises in ways that the federal Act and regulations do not." *Id.*

In essence, California's statute substitutes a new regulatory scheme for the one the FSIS

uses. Where under federal law a slaughterhouse may take one course of action in handling a nonambulatory pig, under state law the slaughterhouse must take another.

*Id.*[7]

Defendant attempts to distinguish *National Meat* on the ground that, there, the Ninth Circuit was examining the first sentence of the relevant preemption provision in the FMIA, which provides:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment.

21 U.S.C. § 678. It is true that there are differences between this language and the second sentence, applicable in this case:

> Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, <u>but any State ... may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment</u>....

*Id.*[8] In particular, Defendant focuses on the emphasized language, providing specific authority for any State to exercise concurrent jurisdiction with the USDA over articles governed by the FMIA so as to prevent distribution of adulterated or misbranded articles. However, this express grant of concurrent jurisdiction sheds no light on the preemption analysis, as was explained by the Ninth Circuit in *National Broiler Council v. Voss*, 44 F.3d 740, 745-46 (9th Cir. 1994).

In *National Broiler*, trade associations claimed the PPIA preempted a California statute prohibiting wholesalers of poultry from using the word "fresh" on labels for poultry stored at

---

[7] It is worth noting that one of the central disputes in *National Meat* is completely absent here. In *National Meat*, the state defendants argued that the state law was not preempted because it touched upon a subject not covered by the preemption provision at all, namely, which types of animals could proceed to slaughter. *See* 132 S. Ct. at 973. This argument was rejected by the district court and eventually by the Supreme Court. *Id.* Here, by contrast, there can be no dispute that the topic of "slack-fill" falls within the scope of the preemption provision's coverage of "packaging."

[8] The PPIA's preemption provision largely tracks the FMIA's in this and all other relevant respects.

temperatures below 26 degrees Fahrenheit ("F"). *Id*. at 742-43. At the time *National Broiler* was decided, the PPIA only permitted poultry to be labeled "frozen" if it had undergone freezing procedures to bring the internal temperature of the poultry to zero (0) degrees F. *Id*. at 746. Federal regulations permitted raw poultry to be labeled "fresh" if its internal temperature is above zero (0) degrees F and below 40 degrees F. *Id*. at 747.[9]

The Ninth Circuit explicitly rejected defendant's argument that the phrase "in addition to" should be interpreted in light of the preemption provision's allowance for the exercise by the states of concurrent jurisdiction over poultry products. *Id*. at 746. In reaching this conclusion, the Ninth Circuit cited with approval a Sixth Circuit case, *Armour & Co. v. Ball*, 468 F.2d 76, 84 (6th Cir. 1972), construing identical language in the FMIA as permitting state enforcement of federal, not state, misbranding provisions. *National Broiler*, 44 F.3d at 746. In addition, the Ninth Circuit noted that elsewhere in the PPIA, Congress explicitly provided "that the states could develop standards <u>stricter</u> than the federal standards." *Id*. (emphasis added) (citing 21 U.S.C. § 454(a)(1)) (authorizing the USDA to cooperate with appropriate state agencies in developing and administering inspection requirements "at least equal to" the requirements contained in the PPIA). That the second sentence of both the FMIA and PPIA preemption provisions expressly provides for the exercise of concurrent jurisdiction by the state of California does not inform interpretation of the phrase "in addition to," which is used in both the first and second sentences.

*National Broiler* also provides critical guidance in interpreting this statutory language. There, the Ninth Circuit found that the PPIA preemption provision's language "in addition to, or different than" was indistinguishable from the concept of "not identical." *Id*. at 745; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 452 (2005) ("in addition to or different from" language in Federal Insecticide, Fungicide, and Rodenticide Act's preemption provision "does not pre-empt any state rules that are fully consistent with" federal requirements). Because it was undisputed that poultry products

---

[9] This "absurdity," *Nat'l Broiler*, 44 F.3d at 749 (O'Scannlain, J., concurring), was corrected by subsequent Congressional action, but not until after *National Broiler* was decided.

chilled between 1 and 25 degrees F could be labeled as "fresh" in compliance with federal law but not comply with the California regulations, the Ninth Circuit concluded that California's requirements were "at least in addition to those labeling requirements made under the PPIA." *Id*. at 745-46 (internal alterations adopted). Alternatively, California's "fresh" labeling regulation at issue in National Broiler was preempted because it was "different than" existing federal poultry labeling requirements. *Id*. at 746. Although federal regulations did not define "fresh," they did define "frozen," and the USDA reasonably interpreted its own regulations in a policy document to permit any poultry not properly labeled as "frozen" to be labeled as "fresh." *Id*. at 746-47.

A similar result was reached in *Jones v. Rath Packing Co*., 430 U.S. 519 (1977), which concerned labeling requirements imposed by the FMIA. The FMIA's prohibition against "misbranded" products includes a requirement that packages or containers bear "a label … (B) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical court: Provided, That … reasonable variations may be permitted, and exemptions as to small packages may be established, by regulations prescribed by the Secretary." *Id*. at 529 (citing 21 U.S.C. § 601(n)(5)). Implementing regulations expand upon the meaning of "reasonable variations":

> The statement [of net quantity of contents] as it is shown on a label shall not be false or misleading and shall express an accurate statement of the quantity of contents of the container exclusive of wrappers and packing substances. Reasonable variations caused by loss or gain of moisture during the course of good distribution practices or by unavoidable deviations in good manufacturing practice will be recognized. Variations from stated quantity of contents shall not be unreasonably large.

*Id*. (citing the version of 9 C.F.R. § 317.2(h)(2) in operation when *Rath Packing* was decided). In sum "the FMIA, as implemented by statutorily authorized regulations, require[d] the label of a meat product accurately to indicate the net weight of the contents unless the difference between stated and actual weights is reasonable and results from the specified causes." *Id*. at 529-30.

In contrast, California's own regulation provided: "the average weight or measure of the packages or containers in a lot of any … commodity sampled shall not be less, at the time of sale or offer for sale, than the net weight or measure stated upon the package." *Id*. at 526 (citing Cal. Bus. &

Prof. Code § 12211). California regulators implemented this standard through a sampling procedure that failed to take into account variations caused by moisture loss. *Id*. at 526-27. Relying upon one of the preemption provisions at issue in this case, the Supreme Court reasoned "[t]his explicit pre-emption provision dictates the result" because "California's use of a statistical sampling process to determine the average net weight of a lot ... makes no allowance for loss of weight resulting from moisture loss during the course of good distribution practice," rendering California's regulatory scheme "different than" the federal requirement, which permits manufacturing deviations and variations caused by moisture loss during good distribution practice. *Id*. at 527-28.

Here, the CFPLA prohibits nonfunctional slack fill in packages, a prohibition that is simply nonexistent under federal law. The only possible distinction that can be drawn between this case on the one hand and *National Meat*, *National Broiler*, and *Rath Packing* on the other is the fact that these other cases involved explicit federal regulatory provisions on point regarding the challenged conduct. In *National Meat* the above-described regulatory provisions explicitly defined how nonambulatory animals were to be treated at slaughter. 132 S. Ct. 968-69. In *National Broiler*, a USDA policy memo interpreted its own regulations to permit poultry processors to label poultry as "fresh" if it had been stored at 40 degrees or less and had not been "frozen." 44 F.3d at 746. In *Rath Packing*, detailed federal regulations spelled out how packaging was to be sampled. 430 U.S. at 529-30.

Here, Plaintiff has pointed to no guidance or other agency interpretation that expressly permits packaged meat and poultry products to contain slack fill (i.e. a regulation that expressly conflicts with federal law). Given this, Defendant would have this Court view the CFPLA's slack fill provisions as a permissible expansion upon the FMIA's general statutory definition of "misbranded" and "misleading." *See* Doc. 37 at 14.

There is at least one Court of Appeals decision that supports Plaintiff's position. In *Hawkins v. Leslie Pool Mart, Inc*., 184 F.3d 244 (3d Cir. 1999), a consumer filed various state law tort claims against the manufacturer and seller of chlorine tablets, alleging, among other things, that defendant: failed to warn purchasers that the tablets could decompose and generate harmful fumes; failed to provide

adequate directions regarding the opening, closing and/or storage of the container; and failed to package the product in a manner adequate to prevent excessive generation of fumes. 184 F.3d at 247. Defendant relied upon the preemption provision contained within the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which provides, in pertinent part:

> (a) In general
>
> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
>
> (b) Uniformity
>
> <u>Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.</u>

7 U.S.C. § 136v (emphasis added). The Third Circuit found that Hawkins' claims based upon failure to label and failure to provide instruction were preempted by FIFRA, pointing out that EPA had promulgated extensive "specific labeling requirements" and concluding these "requirements for labeling pesticides are sufficiently specific to mandate preemption of claims based on state statutes or common law." *Id.* at 249, 251.

However, Hawkins' packaging claims were found not to be preempted. The Third Circuit acknowledged that EPA had the authority to promulgate regulations regarding container design, but reasoned: "the preemptive reach of FIFRA is dependent on agency regulations." *Id.* at 253. With this in mind, the Third Circuit examined EPA regulations pertaining to packaging and found only one relevant regulatory provision, which prescribed requirements for child-resistant packaging of pesticide products and devices. *Id.* (citing 40 C.F.R. § 157.20). Because "despite a potentially broad scope of authority, the EPA has thus far limited its exercise of power to the area of child-resistant packaging.... where, as here, a preemption provision is dependent on government regulations, we cannot extend the reach of that provision to areas not actively regulated by the federal government." *Id. Hawkins* held:

> [T]he EPA's failure to promulgate packaging regulations outside the area of child-resistant packaging is fatal to [defendant's] preemption argument. When no federal packaging requirements have been established, logic dictates that a state law packaging requirement cannot be different from or in addition to the absent federal requirement.

17

*Id*. at 253-54.

The Court finds *Hawkins* not persuasive under the present circumstances. *Hawkins* relied upon and discussed at length the Supreme Court's decision in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996). Medtronic evaluated the preemptive effect of the 1976 Medical Device Amendments to the Food and Drug Act of 1906 ("MDA") on state law claims for common-law negligence and strict liability brought against the manufacturer of an allegedly defective pacemaker. *See id*. at 474. The preemption provision at issue in that case provided:

> a) General rule
>
> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
>> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>>
>> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). To understand the motive underlying the preemption provision, the Supreme Court examined the legislative history of the 1976 MDA and concluded: (1) that "any fears regarding regulatory burdens were related more to the risk of additional federal and state regulation rather than the danger of pre-existing duties under common law"; and (2) that there was "nothing in the hearings, the Committee Reports, or the debates suggesting that any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies against manufacturers and distributors of defective devices." 518 U.S. at 490-91.

> If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing product liability litigation. Along with the less-than-precise language of § 360k(a), that silence surely indicates that at least some common-law claims against medical device manufacturers may be maintained after the enactment of the MDA.

*Id*. at 491. Moreover, regulations promulgated by the FDA expressly provide that state requirements are pre-empted "only" when the FDA has established "specific counterpart regulations or ... other specific

requirements applicable to a particular device," 21 CFR § 808.1(d), an interpretation directly supported by the language of the preemption provision. In light of these findings, the *Medtronic* Court concluded that the preemption provision only applied to "[s]tate requirements [that] relate 'to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device, and the regulations provide that state requirements of general applicability" are not pre-empted except where they have "the effect of establishing a substantive requirement for a specific device." *Id*. at 500 (internal quotation and citation omitted). Moreover, under the MDA's preemption provision, federal requirements must be "applicable to the device" in question, and, according to the regulations, pre-empt state law only if they are "specific counterpart regulations" or "specific" to a "particular device." *Id*.

> The statute and regulations, therefore, require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations.

*Id*. After engaging in such a comparison, the Supreme Court concluded that the common law claims against Medronic were not preempted by the federal drug labeling and manufacturing requirements:

> The generality of those requirements make this quite unlike a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers. Rather, the federal requirements reflect important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation that the statute or regulations were designed to protect from potentially contradictory state requirements.

> Similarly, the general state common-law requirements in this suit were not specifically developed "with respect to" medical devices. Accordingly, they are not the kinds of requirements that Congress and the FDA feared would impede the ability of federal regulators to implement and enforce specific federal requirements. The legal duty that is the predicate for the [plaintiffs'] negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products.

> Similarly, the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force. These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be "with respect to" specific devices such as pacemakers.

*Id*. at 500-502.

Hawkins relied upon the reasoning of *Medtronic* to conclude that even though FIFRA permitted EPA to regulate packaging, because EPA had failed to promulgate such regulations (apart from requiring child-resistant packaging), state common law claims challenging a product's packaging were not preempted. *Hawkins*, however, failed to acknowledge the unique statutory language and regulatory interpretation thereof discussed in *Medtronic*. This Court has serious doubts about whether it is reasonable to draw a parallel between the relevant preemption language in the MDA and that in FIFRA. *Cf. Hawkins*, 184 F.3d at 254 (acknowledging that its holding was at least arguably in conflict with *Lowe v. Sporicidin International*, 47 F.3d 124, 129 (4th Cir. 1995), *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir.1993), and *Papas v. Upjohn Co.*, 985 F.2d 516, 518 (11th Cir.1993)).

In any event, the present case does not concern the preemption of a common law claim. Rather, it concerns a state regulation that plainly <u>adds</u> to the regulatory burden faced by a manufacturer that is indisputably subject to the FMIA and PPIA. As the district court in *Rath Packing* stated:

> The Congress here has left no doubt. It is *the* provisions of *the* federal Wholesome Meat Act of 1967 that are applicable to mislabeling or misbranding that must be applied. Neither state legislatures nor state officers can add or subtract from those definitions. If administrative definition of "reasonable variances" is desirable, it is the United States Secretary of Agriculture who must speak. When he fails to speak or misspeaks his authority, the state cannot substitute its voice. Defendants here do not, in any sense of the word, pretend to be applying federal statutory standards. The enforcement of California Business and Professions section 12211 and its implementation in California Administrative Code Article 5 exceeds the concurrent enforcement rights of the state and its officers.

*Rath Packing Co. v. Becker,* 357 F. Supp. 529, 535 (C.D. Cal. 1973) *aff'd in part, rev'd in part on other grounds,* 530 F.2d 1295 (9th Cir. 1975), *aff'd sub nom. Jones v. Rath Packing Co*., 430 U.S. 519 (1977).

Defendant's position cannot possibly be the law. If, as *National Broiler* holds, "in addition to or different than" is linguistically indistinguishable from "not identical," how can state regulation be permitted to add to a regulatory burden that is absent under federal law? Second, as *National Broiler* noted, Congress knows how to permit a state to expand upon federal standards and explicitly provided for such authority in the PPIA. *Id.* (citing 21 U.S.C. § 454(a)(1)) (authorizing the USDA to cooperate

with appropriate state agencies in developing and administering inspection requirements "at least equal to" the requirements contained in the PPIA). Finally, the FMIA and PPIA implementing regulations are not totally devoid of regulations concerning package fill. As noted above, 9 C.F.R. § 317.8(5)(i) prohibits package coverings that will tend to mislead consumers as to the "color, quality, or kind of product" they wrap, while 9 C.F.R. § 317.8(17) prohibits using "packing substance[s]" that will result in the container being so filled as to be misleading. No party has cited to and the Court has been unable to locate any authority purporting to explain why the relevant federal agency addressed these issues and not others. In light of the plain language in the preemption provision, which *National Meat* found to "sweep broadly," the CFPLA's slack-fill provisions are "requirement[s] in addition to or different than" those set forth in the FMIA and PPIA. A reading of the language "in addition to or different than" which permits the CFPLA to expand upon the existing regulatory requirements imposed under the FMIA and PPIA would be an impermissibly "cramped reading" of the preemption provision.[10]

## F.   **Preempted v. Inoperative.**

Alternatively, Defendant also argues that, even if the CFPLA does impose requirements "in addition to or different" from provisions of the FMIA and PPIA, any such provisions of the CFPLA are rendered inoperative, not preempted, by virtue of certain passages in the CFPLA itself. Defendant first points to California Business & Professions Code § 12613, which provides:

> If any provision of this chapter is less stringent or requires information different from any requirement of Section 4 of the act of Congress entitled "Fair Packaging and Labeling Act" (P.L. 89-755; 80 Stat. 1296; 15 U.S.C. 1451-1461) or of any regulation promulgated pursuant to that act, the provision is inoperative to the extent that it is less stringent or requires information different from the federal requirement, in which event the federal requirement is a part of this chapter.

---

[10] This conclusion is supported by the legislative history, which demonstrates that national uniformity was one of the key purposes of the FMIA and PPIA preemption provisions. Before passage of the preemption language, the House Committee on Agriculture stated:

> One of the more serious dangers to the consumer has been in the labeling of poultry and the lack of proper labeling. This bill would provide for <u>standards of fill</u> for containers, for style and size of type on the labels, for containers which are not deceptive, and for labeling limitation by States. Opportunities to deceive the consuming public would be reduced through application of uniformity to the elements in labels.

H.R. Rep. No. 1333 at 3, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 3426, 3428. Although this passage does focus on labeling, it certainly indicates Congress considered packaging to be a related issue.

Cal. Bus. & Prof. Code § 12613. Defendant maintains that this provision renders inoperative any terms that are "different" or "in addition to" federal law, and results in them being replaced by the language of federal law. Doc. 39 at 8. This argument is without merit for several reasons. First, facially, § 12613 refers only to the FFPLA, not to either statute at issue in this case. Second, even if this case concerned the FFPLA (or if § 12613 referenced either the FMIA or PPIA), Defendant's contention that such language precludes a preemption finding has been rejected by the Ninth Circuit's ruling in *Rath Packing*, which reasoned that a California provision regarding net quantity labeling was "not saved by Cal. Bus. & Prof. Code § 12613," because "[n]o California standard, even if of equal or greater stringency than the federal standard, may be enforced if it is different from the federal standard." *Rath Packing Co. v. Becker*, 530 F.2d 1295, 1317 n. 29 (9th Cir. 1975) *aff'd sub nom. Jones v. Rath Packing Co.*, 430 U.S. 519 (1977).[11]

Defendants also cite California Bus. & Prof. Code § 12612, which provides:

> The sale of any commodity packaged in a container, wherein both the container and the contents thereof comply with any act of Congress or rules or regulations promulgated thereunder, appertaining to weight, measure or count, does not violate the provisions of this chapter; nor does the sale of malt beverages in containers complying with a rule, regulation or an approval of the United States Treasury Department, Internal Revenue Service or Bureau of Alcohol, Tobacco and Firearms, or of the State Department of Public Health and pertaining to weight, measure or count constitute a violation of the provisions of this chapter.

Relying on this provision, Defendant insists that Plaintiff should be required to demonstrate compliance with federal law in order to demonstrate compliance with state law. Doc. 39 at 9. This, Defendant suggests, is the result of the concurrent jurisdiction granted the states in the FMIA and PPIA. *Id.* This turns preemption on its head. As *National Broiler* held, the concurrent jurisdiction granted under the PPIA (and, by analogy, the FMIA) only permits the states to enforce federal requirements. 44 F.3d at 746. Moreover, the record demonstrates that Plaintiff been threatened with enforcement action under the state slack fill regulations on numerous occasions. Defendant would have Plaintiff respond to these

---

[11] Defendant again attempts to distinguish *Rath Packing* on the ground that here Plaintiff has pointed to no federal statute or regulation that directly allows the types of slack fill prohibited in California. This argument begs the question and conflates the preemption analysis with its own argument based upon the statutory language of Cal. Bus. & Prof. Code § 12613.

threats by <u>proving</u> compliance with <u>federal packaging regulations</u>. This reverses the normal burden of proof and seeks to evade the impact of preemption. As discussed above, the state slack fill regulations are preempted as to products regulated by the FMIA and PPIA. Although the FMIA and PPIA permit concurrent jurisdiction, a state must enforce the federal requirements through proper channels, not by making an end run around the preemption clause by threatening enforcement of state provisions while offering federal compliance as an affirmative defense.

### 1.   Scope of Relief/ Severability.

Defendant makes the somewhat confusing argument that even if the challenged provisions of the CFPLA are preempted, they should be severed from the remainder of the statute. Whether invalid portions of a state statute are severable from other portions of that statute is a question of state law. An invalid portion of a statute may be severed from a valid portion if the invalid provisions are (1) grammatically, (2) functionally, and (3) volitionally severable from the remaining portions of the statute. *See, e.g.*, *Hotel Employees & Rest. Employees Int'l Union v. Davis*, 21 Cal. 4th 585, 613 (1999). It is simply not necessary to decide severability here. Plaintiff requests that only certain portions of the CFPLA be declared unconstitutional by virtue of preemption by federal law. The real question is whether Plaintiff's requests are overbroad.

Specifically, Plaintiff requests permanent injunctive and declaratory relief that:

> 1.     The Federal Meat Inspection Act, 21 U.S.C. § 601 et seq., and the Poultry Products Inspection Act, 21 U.S.C. § 451 et seq., expressly preempts California Bus. & Prof. Code §§ 12606(a), 12606(b), 12606.2(b), and 12606.2(c), as applied to Del Real's meat and poultry products that are subject to the FMIA or PPIA.
>
> 2. Defendant and her agents, servants, employees, officers, representatives, successors and assigns, and all persons, firms, and corporations acting in connection or participation with Defendant or on her behalf, are hereby PERMANENTLY ENJOINED AND RESTRAINED from enforcing the slack fill requirements in Cal. Bus. & Prof. Code §§ 12606(b) and 12606.2(c), or enforcing Cal. Bus. & Prof. Code §§ 12606(a), 12606(b), or 12606.2(b) if interpreted to include said slack fill requirements, against Del Real's meat and poultry products that are subject to the FMIA and PPIA.

Doc. 30 at 7.

Section 12606(b)[12] and 12606.2(c)[13] implement California's prohibition against slack fill, the central focus of this lawsuit. The analysis provided above demands a declaration that these are preempted.

Section 12606(a) and 12606.2(b) are more generic. Section 12606(a) provides: "No container wherein commodities are packed shall have a false bottom, false sidewalls, false lid or covering, or be otherwise so constructed or filled, wholly or partially, as to facilitate the perpetration of deception or fraud." Section 12606.2(b) provides: "No food containers shall be made, formed, or filled as to be misleading." The record does not reveal any indication that Defendant would use this generic language to make an end run around any finding that California's slack fill provisions are preempted as to any product regulated by the FMIA and/or PPIA. It is unnecessarily overbroad to include these provisions in the injunction.

## V. CONCLUSION

For the reasons set forth herein, with the exception of the slight modification to Plaintiff's requested relief discussed immediately above, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED.

THE COURT HEREBY ORDERS AND DECLARES that:

1.     The Federal Meat Inspection Act, 21 U.S.C. § 601 et seq., and the Poultry Products Inspection Act, 21 U.S.C. § 451 et seq., expressly preempts California Bus. & Prof. Code §§ 12606(b) and 12606.2(c), as applied to Del Real's meat and poultry products that are subject to the FMIA or PPIA.

---

[12] Section 12606(b) provides: "No container shall be made, formed, or filled as to be misleading. A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack fill. Slack fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack fill is the empty space in a package that is filled to less than its capacity for reasons other than the following...[listing exceptions]"

[13] Section 12606(c) provides: "A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack fill. Slack fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack fill is the empty space in a package that is filled to less than its capacity for reasons other than the following... [listing exceptions]."

2.      Defendant and her agents, servants, employees, officers, representatives, successors and assigns, and all persons, firms, and corporations acting in connection or participation with Defendant or on her behalf, are hereby PERMANENTLY ENJOINED AND RESTRAINED from enforcing the slack fill requirements in Cal. Bus. & Prof. Code §§ 12606(b) and 12606.2(c), against Del Real's meat and poultry products that are subject to the FMIA and PPIA.

The Clerk of Court is directed to enter judgment for Plaintiff and against Defendant.

IT IS SO ORDERED.

Dated:   **August 19, 2013**               **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE